UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

ANDRE K. DAVIS, # 198028,            )
                                     )
             Plaintiff,              )    Case No. 1:12-cv-258
                                     )
v.                                   )    Honorable Robert Holmes Bell
                                     )
SHERRY WALTON, et al.,               )    **REPORT AND RECOMMENDATION**
                                     )
             Defendants.             )
_____)

       This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Plaintiff's claims arise out of his prison work assignments at the Earnest C. Brooks Correctional Facility (LRF). The defendants are LRF's Assistant Deputy Warden (ADW) Sherry Walton and Classification Director Dara Johnson. Plaintiff alleges that in September 2010, ADW Walton retaliated against him in violation of his First Amendment rights when she assigned another inmate to flower bed horticulture work. He alleges that in January 2011, defendants Walton and Johnson retaliated against him in violation of his First Amendment rights when recreation clerk work was assigned to another prisoner. He alleges that in September 2012, ADW Walton retaliated against him in violation of his First Amendment rights when all the prison's horticultural workers were removed from their work job assignments after several inmates had to be taken to the hospital following their ingestion of the leaves and seeds of dangerous plants from the prison garden.[1]

---

[1] All other claims were dismissed on July 31, 2012. (docket #s 7, 8).

Plaintiff seeks an award of damages and an injunction compelling defendants to expunge a "false" work report from his record. (Am. Compl. at 7, docket # 22, ID# 99).

The matter is before the court on defendants' motion for summary judgment. (docket # 30). Plaintiff has filed his response. (docket #s 40-41). For the reasons set forth herein, I recommend that defendants' motion for summary judgment be granted and that judgment be entered in their favor on all plaintiff's claims.

## **Summary Judgment Standard**

Summary judgment is appropriate when the record reveals that there are no genuine issues as to any material fact in dispute and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Sadie v. City of Cleveland*, 718 F.3d 596, 599 (6th Cir. 2013). The standard for determining whether summary judgment is appropriate is "whether 'the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Pittman v. Cuyahoga County Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). The court must draw all justifiable inferences in favor of the party opposing the motion. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Adams v. Hanson*, 656 F.3d 397, 401 (6th Cir. 2011).

A party asserting that a fact cannot be genuinely disputed must support the assertion as specified in Rule 56(c)(1). FED. R. CIV. P. 56(c)(1). Once the movant shows that "there is an absence of evidence to support the nonmoving party's case," the nonmoving party has the burden

of coming forward with evidence raising a triable issue of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To sustain this burden, the nonmoving party may not rest on the mere allegations of his pleadings. FED. R. CIV. P. 56(e)(2), (3); *see El-Seblani v. IndyMac Mortg. Servs.*, 510 F. App'x 425, 427 (6th Cir. 2013). The motion for summary judgment forces the nonmoving party to present evidence sufficient to create a genuine issue of fact for trial. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1990). "A mere scintilla of evidence is insufficient; 'there must be evidence on which a jury could reasonably find for the [non-movant].'" *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 549 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 252); *see Davis v. Cintas Corp.*, 717 F.3d 476, 491 (6th Cir. 2013).

**Proposed Findings of Fact**

The following facts are beyond genuine issue.[2] Plaintiff is an inmate serving life sentences in the custody of the Michigan Department of Corrections (MDOC). (Plf. Decl. ¶ 38, docket # 41, ID# 299). On June 1, 2010, he was transferred to the E. C. Brooks Correctional Facility (LRF). (Plf. Decl. ¶ 4, ID# 293: Plf. Aff. ¶ 1, docket # 41, ID# 325).

---

[2]Plaintiff's amended complaint is verified under penalty of perjury. It is considered as an affidavit in opposition to defendants' motion for summary judgment. *See El Bey v. Roop*, 530 F.3d 407, 414 (6th Cir. 2008); *Williams v. Browman*, 981 F.2d 901, 905 (6th Cir. 1992). However, "verified" arguments and legal conclusions are not evidence. Legal conclusions, whether asserted in an affidavit or verified complaint, do not suffice to create a genuine issue of material fact for trial. *See Medison Am. Inc. v. Preferred Med. Sys., Inc.*, 357 F. App'x 656, 662 (6th Cir. 2009); *see also Stine v. State Farm Fire & Cas. Co.*, 428 F. App'x 549, 550 (6th Cir. 2011) (A "conclusory affidavit bypasses the specific-facts requirement of Federal Rule of Civil Procedure 56 necessary to forestalling summary judgment.").

1. Morning Shift General Yard Worker Job Assignment

On June 8, 2010, LRF's Classification Director Dara Johnson conducted an orientation session. She gave newly-assigned LRF prisoners packets of information, including a list of available work assignments. On June 9, 2010, Ms. Johnson conducted initial work assignment classification interviews. Plaintiff requested placement in the job pools for horticulture and clerk. (Plf. Decl. ¶ 7, ID# 294). Johnson instructed plaintiff to choose a specific clerk department. (Plf. Decl. ¶ 7, ID# 294). Plaintiff asked Johnson to "just put [him] down as clerk, and that way whatever department came open first, [he] could be put in it." According to plaintiff, "Johnson agreed to put just 'Clerk' onto [his] Program Classification Report." (Plf. Decl. ¶ 9, ID# 294). Ms. Johnson never promised plaintiff a clerk job or any other job. (Plf. Dep. at 22, docket # 41, ID# 316; Plf. Decl. ¶¶ 33-35, ID#s 298-99). She never promised plaintiff that he would receive the work assignment of his choice. (Johnson Aff. ¶ 4, docket # 31-2, ID# 148). On June 9, 2010, Ms. Johnson placed plaintiff in the job pools for horticulture and clerk as he had requested. (Am. Compl. ¶¶ 2, 4, docket # 22, ID# 93; Johnson Aff. ¶ 4, ID# 148; 06/09/10 Classification Report, docket # 41, ID# 306). On July 29, 2010, plaintiff received a work assignment as a "Morning Shift General Yard Worker aka 'AM Yard Crew.'" (Am. Compl. ¶ 5, ID# 93; Plf. Aff. ¶ 5, ID# 325).

Classification Director Johnson was on medical leave from August 3, 2010, through October 4, 2010. (Johnson Aff. ¶ 5, ID# 148). On August 9, 2010, plaintiff filed a grievance against Johnson complaining that he was being paid at the wrong hourly rate: Grievance No. LRF-10-08-1263-02C.[3] (Plf. Aff. ¶ 6, docket # 41, ID# 325). Johnson was not aware of plaintiff's grievance

---

[3]Plaintiff later filed a second grievance regarding his Yard Crew pay rate, which was rejected by the prison's grievance coordinator as duplicative. (docket # 41, ID# 308).

because she was on medical leave. (Johnson Aff. ¶ 5, ID# 148). On August 9, 2010, Assistant Deputy Warden (ADW) Sherry Walton reviewed the grievance with plaintiff. According to plaintiff, Walton "stated on the grievance form, as resolution, 'Your [pay] rate has been changed.'" (Plf. Aff. ¶ 7, ID# 325). Plaintiff states that Walton inquired: "Is this really how you want to begin your time at this facility?" (Am. Compl. ¶ 6, ID#s 93-94). He states that he took Walton's inquiry "to be a thinly veiled threat." (*Id.*).

2. <u>Horticultural Worker-Flower Crew Work Assigned to Prisoner Lackey</u>

Plaintiff began performing volunteer work in the prison flower beds helping Prisoner Lackey. (Plf. Decl. ¶¶ 19-21, ID# 296). Plaintiff states that on some date after a "Flower Bed Horticulture position opened up" he "stopped defendant Walton en route to her office in the school building to request the Flower Bed assignment." (Plf. Decl. ¶ 22, ID# 296). Prisoner Lackey received the Flower Bed work assignment. (Plf. Decl. ¶ 25, ID# 297). Plaintiff states: "I continued to maintain the Flower Beds as a Volunteer, while Prisoner Lackey received payment for my labor." (Plf. Decl. ¶¶ 26, 38, ID#s 297, 299-300).

On September 7, 2010, plaintiff wrote a grievance. It was received by LRF's grievance coordinator on September 9, 2010, and it was assigned Grievance No. LRF-10-09-01417-02E. (Grievance, docket # 31-4, ID# 160; Plf. Aff. ¶ 8, ID# 325). Plaintiff complained that ADW Walton had given the flower bed horticulture job that he wanted to prisoner Lackey.[4] Plaintiff

---

[4]Plaintiff's declaration and correspondence establish that Prisoner Lackey was the inmate he had alluded to in this grievance. (Plf. Decl. ¶¶ 19-26, ID#s 296-97; 9/8/10 letter, docket # 41-2, ID #s 338-39).

argued that Lackey should not have received the work assignment, because he had a medical restriction limiting him to light-duty work:

> PD 03.02.130. Staff shall avoid any action that gives the appearance of reprisal for using the grievance procedure. On June 9, 2010, during Initial Classification I was placed in the Horticulture and Clerk Pools. On July 26, 2010, I was assigned to the 1st Shift Yard Crew. On August 20, 2010, ADW Walton interviewed me on a written grievance to correct my Yard Crew pay rate. During said interview I followed up with ADW Walton re: my kite for placement in the <u>then</u> <u>vacant</u> Flower-Bed Horticultural position. As the 2 weeks ADW Walton told me to wait while she learned how to perform Ms. Johnson's job during her sick-leave, had elapsed, ADW Walton <u>again</u> told me "they" needed time to learn Ms. Johnson's job. On August 31, 2010, "they" assigned a prisoner with a "Light-duty" medical work restriction to the Horticulture position. Proving "they" not only knew how to perform Ms. Johnson's job -- "they" also knew how to <u>create new positions</u>; despite LRF 05.02.110 stating "<u>New positions shall not be created</u>." Without LRF having a Greenhouse, etc., it is physically impossible to perform "light-duty" Horticulture at LRF, and be consistent with the Horticulture job Descriptions in the CFA Classification Manual. Said Manual also states at p. 21, § IV., §§ 1, 2 "<u>Assignments shall be made to the capabilities of the prisoner</u>." With full knowledge that I had been maintaining the Flower beds as a "volunteer" while awaiting placement in the <u>vacant</u> Horticulture position I was classified to, ADW Walton retaliated against me by placing a prisoner whose physical limitations are incompatible with <u>safe</u> performance of such an assignment.

(docket # 31-4, ID# 160).

Plaintiff states that on October 13, 2010, ADW Walton interviewed him regarding the above-quoted grievance. (Am. Compl. ¶¶ 10, 11, ID# 94). Plaintiff was belligerent during the interview and later wrote a letter to Ms. Walton apologizing for his behavior. (Walton Aff. ¶ 5, ID# 153). Plaintiff states that Ms. Walton was "very hostile" during this interview, and as he was leaving her office she stated, "I know you don't expect to get a job working under me after this."[5] (Am. Compl. ¶ 12, ID# 94).

---

[5]ADW Walton denies making this statement and the statement on August 9, 2010, that plaintiff now attributes to her. (Walton Aff. ¶¶ 4, 5, ID# 153). Plaintiff's assertion that Ms. Walton made the statements is accepted as true for present purposes.

Plaintiff's grievance was denied at Step I of the grievance process. The Step I response indicated that plaintiff did not know the limitations of the prisoner who had received the position and he did not know how long that prisoner had been on the waiting list for that job assignment. Ms. Walton had no agreement with plaintiff that he would work in the prison gardens. As far as she understood, plaintiff was doing the work that had been assigned to him by his supervisor. The Step I response concluded with a notation that plaintiff would remain on the waiting list until a position was open for a job which he was qualified to perform. (docket # 34-1, ID# 161).

The warden denied plaintiff's Step II appeal. Among other things, she noted that plaintiff still had his yard crew work assignment, that there were few horticultural jobs, and that the horticultural work was seasonal in nature:

> It is noted that the prisoner currently remains working on the AM yard crew. As previously informed by the ADW, the facility is not currently filling any of the very limited number of horticultural work assignments as these are seasonal positions. It is noted that the prisoner is in several other work assignment pools.

(docket # 31-4, ID# 159). On January 14, 2011, the Grievance and Appeals Section denied plaintiff's Step III appeal. (*Id.* at ID# 157).

3. Recreation Clerk Work Assignment

On January 9, 2011, Classification Director Johnson received a letter from plaintiff complaining that another prisoner had been assigned to a work assignment as a recreation clerk. (Johnson Aff. ¶ 6, ID#s 148-49; docket # 31-9, ID# 185). Ms. Johnson responded as follows: "Per PD 05.01.100 clearly states '(F) a prisoner may be given preference for assignment for which he has *related experience* or *training*,' which you do not have any prior experience in this area. Also you asked to be on the list for general clerk not recreation." (docket # 31-9, ID# 185; Johnson Aff. ¶ 6,

ID#s 148-49). Plaintiff had the opportunity to select a specific clerk position as his preferred work assignment from the options of food service clerk, chaplain clerk, recreation clerk, school clerk, hobby craft clerk, law library clerk, classification clerk, special activities clerk, and general clerk. Plaintiff chose "clerk," which Ms. Johnson interpreted as "general clerk." Plaintiff never chose recreation clerk at the classification interview. (Johnson Aff. ¶ 7, ID# 149). Plaintiff's work history did not indicate any prior experience as a recreation clerk. Recreation clerk is separate from general clerk. The prisoner assigned to the recreation clerk job had received the work assignment because he had been on the recreation clerk waiting list and had prior experience as a recreation clerk. (Johnson Aff. ¶¶ 6-8, ID#s 148-49).

Ms. Johnson had been on medical leave and "was not even aware that [plaintiff] had written a grievance against [her]." (Johnson Aff. ¶ 8, ID# 149). Defendant Walton did not make this work assignment and at no time did she ever instruct Classification Director Johnson not to place plaintiff in any work position, including clerk positions. (Johnson Aff. ¶ 3, ID#s 147-48; Walton Aff. ¶ 3, ID#s 152-53).

On January 19, 2011, LRF's grievance coordinator received a grievance from plaintiff and assigned it Grievance No. LRF-11-01-00084-02E. (Grievance, docket # 31-5, ID# 166; docket # 41, ID# 324). In this grievance, plaintiff argued that he should have received the recreation clerk work assignment:

> This grievance is <u>on</u> both Ms. D. Johnson and ADW Walton -- parties identified to ensure compliance with PD 03.02.130 § U (See attached Affidavit at ¶ 13). Classification Director Johnson acted in the furtherance of a threat made by ADW Walton [See attached Affidavit at ¶ 15]. Ms. Johnson manipulated the clerk pool by assigning a prisoner who transferred into LRF over 60 days **after** I was already at LRF, and classified to the Clerk pool. Retaliatory discrimination in classification decisions are imminent when Ms. Berghuis allows subordinates to circumvent Department policy and procedure. In response to a resolution

> kite, on January 12, 2011 Ms. Johnson added an arbitrary and capricious element to her misfeasance with an act of malfeasance. Ms. Johnson, in response to my kite, stated the position that the position she filled was for a Recreation Clerk. LRF has 4 different types of clerk positions [See Affidavit at ¶ 4]. My (CSM-175) Program Classification Report – "Initial Classification" states "Comments/Classification Review/Summary" section, INITIAL 6/9/10 POOLS: HORTICULTURE & <u>CLERK</u>. This is what Ms. Johnson wrote and signed. Not <u>general</u> clerk, or <u>recreation</u> clerk, or <u>hobbycraft</u> clerk. <u>Just</u> Clerk! because "clerk" is what is listed in the OP-LRF 05.01.100 Attachment 1, <u>Designated Special Assignments/Criteria</u> – E. School Tutor/<u>Clerk</u> (NOT recreation clerk, or school clerk, etc.) On 6/9/10 Ms. Johnson submitted my name to be screened for a "Clerk" position. Strict compliance to policy would have mooted future litigation.

(docket # 31-5, ID# 166; docket # 41, ID# 324). The Step I grievance response stated that plaintiff was not in the recreation clerk pool. He was in the horticulture pool and the general clerk pool. Further, the response indicated that plaintiff had "no business" asking the deputy warden to place him in the recreation pool, because the deputy warden had nothing to do with placing prisoners in work pools. Plaintiff "was correctly not given a job as a recreation clerk" because he was in the general clerk pool. Plaintiff was advised that if he would like to be placed in the recreation pool, he could "kite" the classification director. (*Id.*). The denial of plaintiff's grievance was upheld at Steps II and III of the MDOC's grievance process. (docket # 31-5, ID#s 163-65).

    4.  <u>Plaintiff's Horticultural Worker-Flower Crew Work Assignment</u>

    On March 2, 2011, plaintiff wrote a letter to ADW Walton "basically apologiz[ing] for the lack of maturity [he] ha[d] been displaying through profuse grievance writing." (docket # 31-10, ID#s 187-88). Plaintiff stated that he was "kind of sensitive" and "accustomed to getting [his] own way." He "personalized things" and "threw a tantrum." He stated that he had "lost interest in complaining" and intended to "re-focus[] [his] energies in a more positive and beneficial direction." Plaintiff stated that he enjoyed gardening and painting. (*Id.*).

Plaintiff states that when the MDOC closed another prison, Mario Vialpando had seniority over defendant Johnson and bumped her from the position of LRF's classification director. On or about March 15, 2011, plaintiff's request for a horticulture or clerk assignment was forwarded to Mr. Vialpando. On March 25, 2011, Mr. Vialpando gave plaintiff the horticulture worker-flower crew work assignment that he wanted. (Am. Compl. ¶¶ 29-30, ID# 96).

On September 2, 2011, at least four LRF prisoners ingested the leaves or seeds of plants located in the LRF's gardens and were taken by ambulance to a hospital emergency room. (Am. Compl. ¶ 32, ID# 96). An investigation of the incident revealed that the hospitalized prisoners had likely ingested the plant's seeds and leaves for their perceived hallucinogenic properties. The prison gardens were closed. The gardens were searched and the dangerous Jimson Weed plants were marked and removed. (Walton Aff. ¶ 6, ID#s 153-54; docket # 31-11, ID#s 190-92).

On or about September 8, 2011, ADW Walton terminated the work assignments of all LRF's horticultural workers, because the investigation had revealed that the workers were aware of or were complicit in the growing and distribution of the dangerous plants. (Walton Aff. ¶ 6, ID#s 153-54; Am. Compl. ¶ 33, ID# 97; Plf. Dep. at 69, docket # 31-6, ID# 171; Plf. Decl. ¶ 63, ID# 304).

On September 13, 2011, the prison's grievance coordinator received a grievance from plaintiff and assigned it Grievance No. LRF 11-09-01538-02A. (docket # 41, ID# 328). On the space provided for a prisoner's description of the effort made to resolve the issue before filing a grievance, plaintiff described the meeting on September 8, 2011, in which he had been informed that his work assignment would be terminated immediately and that he would be placed on Double 00 status:

> On September 8, 2011, I along with the 5 other Horticultural Workers were summoned up to Control Center for a meeting with ADW Walton and Lt. Riley. At this time, I was notified that, effective immediately, I was terminated from my assignment and would be placed on Double "00" status."

(*Id.*). In the body of his grievance, plaintiff argued that the dangerous plants were not found in his area of control and he objected to the termination report:

> On Friday September 9, 2011, C/O Gregwire (sp?) drafted a termination work reports for contraband found outside my area of control. P.D. 05.01.100, Page 4, W: "Staff supervision shall be provided for each work assignment. <u>No prisoner shall have authority or control over another prisoner</u>."
>
> My co-worker Hall and I planted the flower beds together, and then split the area. He primarily maintained the Flower beds by Control Center and Health Care. I maintained the Beds around the LTA/School, and helped a volunteer with the Butterfly Garden. No contraband was found in my area of control. C/O Gregwire (sp?) acknowledged that no contraband was found in the Flower Beds, but we (Hall and I) were caught in the "shotgun blast." Which I take to mean, policy has no authority over this situation. To compound matters, the malicious nature of these accusations is evident by the false label of being a threat to the security of staff and the institution found within the summary section of the Termination Work Report. Resolution is that this Falsified Work Report be discarded, and I be reinstated with back-pay.

(docket # 41, ID# 328). Plaintiff was not successful in his attempt to overturn the termination of his favored work assignment. (Am. Compl. ¶¶ 42-50, ID#s 98-99). His grievance was denied at Step I of the grievance process. The grievance response indicated that plaintiff had received his negative work evaluation because dangerous plants were found being grown and cultivated in several garden/flower plots at LRF, including the one plaintiff was responsible for. (docket # 41, ID# 328). The response went on to explain: "Since the plants are considered dangerous, this constitutes a threat to the security and safety of the facility." (*Id.*). It was further noted that containers containing a substance with the appearance and odor of fermenting alcohol had been concealed in the garden. "Per the LRF Garden Rules, growing contraband is forbidden as well as utilizing garden plots for

-11-

concealing contraband will result in immediate removal from the garden program for members who are involved in any way. You were immediately terminated from your assignment as a Horticulture worker and will be placed on Unemployable status in accordance with PD 05.04.100 and 05.02.410. There is no violation of policy." (docket # 41, ID# 328).

Plaintiff states that he "did not grow, cultivate, or distribute any Jimson Weed." Further, he states that no Jimson Weed plants, fermenting beverages, or other contraband was in his area of control. (Plf. Decl. ¶ 57, ID# 302). Plaintiff remains "upset" that in the wake of the Jimson Weed-related prisoner hospitalizations, ADW Walton terminated all the horticultural work assignments rather than being more selective:

A. . . . We all lost our job when she came back to work, all of us got terminated, that's why I was upset, was because she didn't wait to find out who worked where, who was responsible for what, she just went through and said if none of you guys are going to tell me who did it, then I am firing all of you and I was -- I continue to be displeased about that.

Q When you say all of you were fired, all of the seven or so of you guys that worked the horticultural job were fired?

A Yes, all of us, all the horticultural guys that worked there were fired.

(Plf. Dep. at 69, ID# 171).

On March 16, 2012, plaintiff filed this lawsuit.

**Discussion**

On summary judgment, a plaintiff asserting a First Amendment retaliation[6] claim must present proof on which a reasonable trier of fact could find (1) that the plaintiff had engaged

---

[6]"Retaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).

in conduct protected by the First Amendment; (2) that an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from engaging in that conduct; and (3) that the adverse action taken against the plaintiff was motivated, at least in part, by the protected conduct. *Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999) (*en banc*). The plaintiff has the burden of proof on all three elements. *See, e.g.*, *Murray v. Evert*, 84 F. App'x 553, 556 (6th Cir. 2003).

"The first element [plaintiff] must establish for his retaliation claim[s] [are] that he was engaged in conduct protected by the First Amendment." *Hill v. Lappin*, 630 F.3d 468, 472 (6th Cir. 2010). The Sixth Circuit recognizes that a prisoner's filing of a formal written grievance can constitute protected conduct. *See Herron v. Harrison*, 203 F.3d 410, 415 (6th Cir. 2000). Frivolous grievances are not protected conduct. *See Hill v. Lappin*, 630 F.3d at 472; *Lockett v. Suardini*, 526 F.3d 866, 874 (6th Cir. 2008) (calling a hearing officer a "foul and corrupted bitch" was not protected conduct); *Herron v. Harrison*, 203 F.3d at 415. I will assume for present purposes that plaintiff's grievances were not frivolous.

The second element of a retaliation claim is an adverse action against plaintiff that would deter a person of ordinary firmness from engaging in the protected conduct. "[R]outine inconveniences of prison life [] do not constitute adverse action." *Reynolds-Bey v. Harris*, 428 F. App'x 493, 503 (6th Cir. 2011). If this standard is to have any substance at all, a prisoner's failure to receive the prison job of his choice cannot be deemed an adverse action. Until the time that the garden program was shut down, plaintiff was given employment, although perhaps not his first choice of prison job. Prisoners have no constitutionally protected liberty or property interest in prison employment under the Fourteenth Amendment. *See Dellis v. Corr. Corp. of Am.*, 257 F.3d 508, 511 (6th Cir. 2001); *Newsom v. Norris*, 888 F.2d 371, 374 (6th Cir. 1989); *Ivey v. Wilson*, 832

F.2d 950, 955 (6th Cir. 1987) ("[N]o prisoner has a constitutional right to a particular job or to any job."). Prison employment is not employment in the ordinary sense, but represents a part of the rehabilitation program of the prison. The incidents described in this record are routine aspects of prison life. It trivializes the concept of First Amendment retaliation -- which was fashioned by the Supreme Court and the Sixth Circuit to assure vindication of prisoner's free-speech rights -- to allow dissatisfaction over a prison work detail to qualify as an adverse action sufficient to support a constitutional tort.

Under the causation element of a prisoner's *prima facie* case for retaliation, the subjective motivation of the decisionmaker is at issue. "The third element of a First Amendment retaliation claim requires the plaintiff to prove a causal connection between the protected conduct and the adverse action. When assessing motive in the context of a summary judgment motion, bare allegations of malice do not suffice to establish a constitutional claim. This court has held that circumstantial evidence, like the timing of events or the disparate treatment of similarly situated individuals, is appropriate." *Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 399-400 (6th Cir. 2010) (internal quotations and citations omitted). Plaintiff must demonstrate that his protected speech was a substantial or motivating factor in the adverse action taken by defendant. Specifically, plaintiff must point to specific, nonconclusory evidence reasonably linking his speech to the adverse action. *Rodgers v. Banks*, 344 F.3d 587, 602 (6th Cir. 2003). The Sixth Circuit has interpreted this inquiry to mean that a motivating factor is "essentially but-for cause-without which the action being challenged simply would not have been taken." *Vereecke*, 609 F.3d at 400 (quoting *Leonard v. Robinson*, 477 F.3d 347, 355 (6th Cir. 2007), and *Greene v. Barber*, 310 F.3d 889, 897 (6th Cir. 2002)). "Substantial case law from this circuit cautions about the permissibility of drawing an

inference of causation from temporal proximity alone." *Vereecke*, 609 F.3d at 400; *see Tuttle v. Metropolitan Gov't of Nashville*, 474 F.3d 307, 321 (6th Cir. 2007) ("The law is clear that temporal proximity standing alone, is insufficient to establish a causal connection for a retaliation claim.").

Plaintiff has not presented evidence sufficient to support a causal connection between his protected conduct and defendants' actions. Generally, there were significant intervals between plaintiff's grievances and the alleged retaliatory actions. Plaintiff received his work assignment at LRF as a Morning Shift General Yard Worker on July 29, 2010. In September 2010, the horticulture work assignment was awarded to Prisoner Lackey, an inmate who had been working in the prison gardens longer than plaintiff, and plaintiff had been serving as his helper. Plaintiff's criticisms of Lackey's purported physical limitations were leveled after Lackey had received the work assignment. In January 2011, the recreation clerk job was assigned to a prisoner who had been in the recreation job pool and who had experience as a recreation clerk. When Ms. Johnson made the work assignment, she had no knowledge of plaintiff's grievance. Plaintiff's grievances did not prevent him from receiving the horticultural work assignment that he wanted in March 2011. In September 2011, all the prison's horticultural workers lost their work assignments after the Jimson Weed incident. On the present record, no reasonable trier of fact could find a causal connection between plaintiff's grievances and defendants' actions. Further, defendants have shown that they would have taken the same actions if plaintiff had not filed grievances. I find that defendants are entitled to judgment in their favor as a matter of law on all plaintiff's claims.

**Recommended Disposition**

For the foregoing reasons, I recommend that defendants' motion for summary judgment (docket # 30) be granted and that judgment be entered in defendants' favor on all plaintiff's claims.

Dated: December 27, 2013          /s/ Joseph G. Scoville
                                         United States Magistrate Judge

**NOTICE TO PARTIES**

Any objections to this Report and Recommendation must be filed and served within fourteen days of service of this notice on you. 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b). All objections and responses to objections are governed by W.D. MICH. LCIVR 72.3(b). Failure to file timely and specific objections may constitute a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Keeling v. Warden, Lebanon Corr. Inst.*, 673 F.3d 452, 458 (6th Cir. 2012); *United States v. Branch*, 537 F.3d 582, 587 (6th Cir. 2008). General objections do not suffice. *See McClanahan v. Comm'r of Social Security*, 474 F.3d 830, 837 (6th Cir. 2006); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006).